Frank L. SWACKER, Jr., et al., and Railway Labor Executives' Association, Appellants,

v.

SOUTHERN RAILWAY COMPANY, Appellee.

Frank L. SWACKER, Jr., et al., and Railway Labor Executives' Association, Appellees,

v.

SOUTHERN RAILWAY COMPANY, Appellant.

Nos. 10070, 10083.

United States Court of Appeals Fourth Circuit.

Argued Jan. 3, 1966.

Decided April 20, 1966.

Carl W. Newman, Appalachia, Va., and William G. Mahoney, Washington, D. C. (R. C. Shannon, Appalachia, Va., and Mulholland, Hickey & Lyman, Washington, D. C., and Shannon & Newman, Appalachia, Va., on brief), for appellants in No. 10,070 and appellees in No. 10,083.

Jerome Ackerman, Washington, D. C. (John P. McKenna, W. Graham Claytor, Jr., James I. Hardy, Washington, D. C., Robert T. Winston, Jr., and Leslie M. Mullins, Norton, Va., and Covington & Burling, Washington, D. C., on brief), for appellee in No. 10,070 and appellant in No. 10,083.

Before HAYNSWORTH, Chief Judge, and SOBELOFF and BRYAN, Circuit Judges.

ALBERT V. BRYAN, Circuit Judge:

The Interstate Commerce Act, 49 U.S.C. § 5(2) (f), assures employees against prejudice resulting from any transaction, among others, in which one carrier acquires control of another as permitted by the Act, 49 U.S.C. § 5(2) (a) (i). After the acquisition by the Southern Railway Company of the whole of the capital stock of the Interstate Railroad Company, 52 of the latter's employees sued Southern in the District Court invoking these assurances. In short, they say that they were furloughed in anticipation of the acquisition and were not recalled to their jobs because their work was absorbed by Southern.

The plaintiffs were: 12 maintenance-of-way workers (section laborers)[1], 26 maintenance-of-equipment workers (car laborers)[2], 7 machinists (including one blacksmith)[3] and 7 other employees classified generally as clerks.[4]

None of the claims of the section laborers or clerks were sustained. However, 21 of the car laborers and 4 machinists prevailed. The unsuccessful employees now appeal the denial of their claims, and Southern appeals the award to the 25. We overrule the appeals and uphold the determination of the District Court.

The Act authorizes a carrier, with the approval of the Interstate Commerce Commission, to acquire control of another carrier through ownership of its stock, 49 U.S.C. § 5(2) (a) (i), but in this approval the Commission is required to protect the interests of the employees affected by the acquisition, the Act prescribing, 49 U.S.C. § 5(2) (f), these terms:

"(f) As a condition of its approval * * * of any transaction [including a stock acquisition as here] * * * the *Commission shall require a fair and equitable arrangement to protect the interests of the railroad employees affected.* In its order of approval the Commission shall include terms and conditions providing that during the period of four years from the effective date of such order *such transaction will not result in employees of the carrier or carriers by railroad affected by such order being in a worse position with respect to their employment,* except that the protection afforded to any em-

---

1. They are: Elmer Adams, Willie E. Bledsoe, Earl A. Collins, Robert L. Creech, Beldon Fletcher, Charles B. Fletcher, Curtis Holbrook, Billy Jarrett, Glen C. Kindle, F. L. Lane, Cecil R. Laney, and Lloyd Livesay.

2. They are: Dewey Aistrop, Donald R. Carter, E. P. Clark, Elmer Clark, E. F. Clark, Fred M. Clark, Coy Flores, G. M. Frazier, Mesby Frazier, Moran Gibson, W. H. Holt, Milford V. Johnson, R. E. Lane, Elmer P. Lundy, John S. Marrs, Paul H. Phillips, H. H. Reed, Ralph W.

Slagle, Ray Stratton, Frank L. Swacker, Jr., Loyd Tignor, R. E. Wade, M. D. Watts, Coy Weatherly, O. F. Wells, and R. J. Wells.

3. They are: Paul H. Body, Elmo Bush, F. E. Cooper, Jack Coward, William M. Huneycutt, D. G. McCormack, and R. C. Seale.

4. They are: Raymond Davidson, William H. Fields, Louise Fletcher, William Howard Johnson, Jr., Willis M. Jones, Jr., June Luntsford and Kyle Wampler.

ployee pursuant to this sentence shall not be required to continue for a longer period, following the effective date of such order, than the period during which such employee was in the employ of such carrier or carriers prior to the effective date of such order."

The application of Southern seeking ICC approval of its purchase of Interstate's capital stock was filed in June 1959 and approved in February 1961, effective June 6, 1961. To guarantee protection of Interstate's employees pursuant to the Act, the Commission in the approval imposed upon Southern what are known as the New Orleans Conditions, which are stated in New Orleans Union Passenger Terminal Case, 282 ICC 271.

The plaintiffs were all furloughed—not discharged—prior to the effective date of Southern's acquisition. They charge, however, that they were relieved in anticipation of the acquisition, and but for the acquisition they would have been recalled to do the work specified in their complaints, which they say was Interstate's. On these premises the plaintiffs contend that they were "affected" by the transaction and were thereby put "in a worse position with respect to their employment". They claim the full amount of their respective wages computed, under the New Orleans Conditions, over the statutory period of 4 years next ensuing from the date of acquisition, June 6, 1961, or for the lesser period if their employment was less than 4 years.

Interstate is located entirely within Wise County, Virginia. The main line extends from Andover through Appalachia to Miller Yard, a distance of approximately 30 miles, connecting with Southern at Appalachia as well as with other roads there and along the way. Branches run off to coal mines in the area. The railroad's principal operation is the transportation of coal received from adjacent mines or as an intermediate carrier for other roads. Total trackage is about 88 miles and the rolling stock includes approximately 3000 50-ton hopper-type coal cars. The offices, main yard, and maintenance and repair shops, where all loco-motives, cars and other equipment were maintained and where new cars had once been built, were at Andover.

The ICC found that Interstate's operating revenues from coal traffic did not warrant the retention of the fleet of 3000 cars, all of which were old and somewhat obsolete, although Interstate actually needed 6000 cars to supply its shippers of coal. Its road and other equipment were in excellent condition. Interstate showed a favorable income balance only by reason of the use of cars of other carriers, the earnings therefrom exceeding the per diem rentals of such cars.

A 50-ton car was not profitable because transportation was more economically and speedily handled in cars of 70-, 90- and 100-ton capacity. The Commission also found that Interstate's expense in maintaining its cars was rapidly increasing and that their size and age did not warrant rebuilding: "[W]ith a fleet of old coal cars of inadequate capacity it appears to be faced with a choice of either foregoing its car-hire rents upon which it relies for its net income, or taking on a dangerously onerous debt for new equipment, or becoming part of a trunk line system". The Commission approved the last choice.

The District Court found there was no alternative—that if the stock control had not been transferred to Southern, Interstate would have been forced from time to time to retire cars as they became useless and depend entirely upon those of other railroads. As a matter of fact, within 3 years after the acquisition, Interstate set aside more than 1000 of its cars.

Underlying consideration of all of its decisions in this case are the following adequately supported findings of the District Court:

"At the outset, however, it should be noted that with regard to *all* of the employees furloughed, the Master found [and the Court agreed]:

(a) that furloughing is nothing new to the employees of Interstate, the device apparently having been utilized several times in the past;

(b.) that all but two of the employees were furloughed *prior* to February 16; 1961, the date of the first order of the I.C.C. approving the report of the Examiner;

(c) that each was furloughed by Interstate and not by Southern;

(d) that Interstate did not act on the advice or direction of Southern in furloughing the employees; and

(e) that the action of Interstate was not in anticipation of the stock acquisition by Southern."

*Car Laborers (26) and Machinists (7)*

These 33 employees have common grievances and press related arguments. With the exception of W. H. Holt, they were furloughed before the ICC examiner's report in October 1960, and he refers to the reason for their lay-off as follows: "Recently it [Interstate] has been able to reduce its personnel by about 30 employees as a result of retiring old worn-out cars and substituting therefor applicant's 100-ton cars, thereby reducing the number of cars handled, and by effecting internal economies in maintenance of way and structures."

Holt, a car laborer, was *discharged* on July 12, 1961 because of intoxication during working hours. For this reason his claim was denied by the master and the Court. We find ample evidence to support this action.

Furloughed car laborers Frazier, Johnson, Slagle and Flores were also denied awards. The first 3 were found to be employed as car inspectors at locations other than Interstate's repair shop. Hence they were not touched by the removal of the work of which they complain, for it would have been performed at the shop. Flores, a boiler-fireman, had been furloughed in May 1960, long prior to the acquisition, being displaced by an Interstate employee having seniority over him. Of the 7 machinists, the claims of Coward, Bush and Cooper were denied. They had been furloughed in December 1960 since their work, formerly performed on two shifts, was consolidated into one and their seniority was subordinate to

those employees retained on the shift. For these reasons none of these furloughs were found by the master or the Court to have been the result of the acquisition, and there is no basis for disturbing this finding.

This leaves 25 employees—21 car laborers and 4 machinists—who contend that they were adversely affected by the following incidents: (1) the pooling of Interstate and Southern cars and the elimination of the interchange at Appalachia; (2) the repair of 467 of Interstate's cars at the Southern shops in Knoxville, Tennessee from August to October 1961; (3) the diversion to a car-building contractor of all work necessary to reconstruct and increase the capacity of 336 used cars purchased by Interstate in November 1963; and (4) the diversion from Interstate of all the work necessary "to cut down and scrap" 1094 Interstate cars no longer usable, and to salvage and store the parts therefrom.

■ (1) *Pooling and Interchange Elimination.* The contention of the 25 employees, as well as of the other furloughed employees, that they were adversely affected by the pooling of the cars of the two railroads is not sustainable. Actually, there was no pooling in the sense that no distinction was made between the ownership of the cars by the two railroads after the acquisition. Indeed, separate records were kept of the use of Interstate's cars by Southern, and of Southern's cars by Interstate, and rentals paid according to these reciprocal uses. True, more Southern cars were used after the acquisition than before but this was because of the lack of serviceable Interstate cars. Indeed, the availability of Southern cars was one of the grounds upon which the ICC examiner recommended the stock transfer. Thus he said:

"In the opinion of Interstate's President, the interests of all concerned in its operation would be best served by having it become a part of the applicant's system, the principal carrier upon whose lines its coal traffic is consumed

and the one best equipped to diversify its traffic and *to supply the cars necessary for the preservation of its service.*" (Accent added.)

The interchange of cars is the process of restoring to each railroad its cars in the possession of the other. The evidence shows that interchange facilities were physically available after the acquisition as before. However, instead of withdrawing their respective cars from a train, to save the time of switching the cars were left in the train, but each railroad accounted to the other for the use of the other's cars. The computation is currently made upon a "wheelage" basis, that is the distance traversed by the car in such use.

The District Judge quite satisfactorily described and explained why he found no injury to the employees by reason of the "pooling" and the "omission" of the interchange. He said:

"The chief contention seems to boil down to this: the men are affected whether or not work is removed by reason of Interstate's acquisition of newer and larger cars from Southern, allegedly without paying any per diem. Along these same lines, counsel contends that the interchange between Southern and Interstate has been eliminated and all the cars are now treated as belonging to one railroad—i. e., the Southern. (The employees are affected, according to counsel, because there are now less cars in use (and thus less to repair) by virtue of the larger capacities of those employed and in addition the cars are newer and require less repair.) The Master found no merit in these claims and this court agrees.

"As has been pointed out, Interstate was renting cars from Southern before the transaction, but there is some evidence that this use increased after the stock acquisition. This might be partially explained (although there is no evidence on the point) if Interstate now rents exclusively from Southern and no other company. Even though this might be a result of the trans-

action, it would not be such as would give rise to any benefits to Interstate employees. It has been admitted that Interstate had to acquire more modern cars. * * * If it chose to acquire some by increased rentals from Southern, this was likewise a decision for management which had great likelihood for occurrence without the acquisition. *The employees were affected to be sure, but not as a direct result of the transaction.* (Accent added.)

"The Master found that Interstate and Southern retained their separate corporate identities and that Interstate continued to pay the per diem to Southern. He further noted that 'the fact that the interchange is not physically made at the time of arrival of the cars is insignificant to the issue, since the dates for calculating wheelage is recorded.' * * * He was clearly correct in these findings that the cars were not pooled."

(2) *Repair of 467 Interstate Cars at Southern Shops.* In August 1961, after the acquisition, Southern began repairs at its Knoxville, Tennessee shop on 467 of Interstate's 50-ton cars. The master and the District Court found that the work could have, and but for the acquisition would have, been done at Interstate's shop. Accordingly the Court held that to the extent of this work the employees had been hurt by the acquisition.

Southern contends that no allowance on this segment of work can be sustained. Its first ground for the assertion is that this undertaking by Southern was not a result of, but rather was created by, the acquisition. The argument is that Interstate was not physically equipped or financially able to perform the work at its shop, and therefore it was necessarily performed by Southern. The second ground is that the proof fails to demonstrate that the complaining employees would have been recalled to do this work. We disagree, as did the District Court, with Southern's contention.

It must be remembered that Interstate was in need of cars. It rented some from

Southern and, as we shall see in a moment, it purchased 336 used cars in November 1963. While it had ceased doing heavy repairs at its shop, it had not withdrawn from light repairs. Concededly, the work done by Southern on the 467 cars of Interstate consisted of light repairs. This work was started within 3 months after the acquisition. Except for that transaction, the District Court found, this work would have been performed at the Interstate shop in Andover. We have no warrant for overturning these findings. On this subject the District Judge stated:

"I think the Master was correct (except as to the extent of the recovery, which will be discussed later) in allowing benefits to the twenty-five employees as a result of the repair work done by Southern. This was clearly work physically diverted by Southern and was the proximate result of the stock acquisition.

"From the evidence it would appear that car repair done by railroads is generally divided into three classes: (1) heavy repair; (2) light repair; and (3) running repair. Running repairs are relatively minor jobs which can be done quickly and without taking the car out of service. As a matter of courtesy, one railroad will do running repairs on cars which it is using but which belong to another company. Light repair seems to be somewhat of a misnomer as it can be a big job, short of a major overhaul, which requires taking the car out of service, at least for a time. Light repairs are *not* done on cars owned by other railroads. The heavy repair entails a major overhaul.

"It seems manifest that the repair work in question should have been done at Interstate's shops in Andover. These were not cars which had been sidetracked and sent to Southern by Interstate, but were rather still in service when cut out of the trains by Southern and directed to the Koster [Knoxville] shops. Defendant admits that light repair was done on these cars, and by general railroading practice, light repair is never done on the cars of another railroad, certainly not as a gratuity and not on 467 cars.

\* \* \* \* \* \*

"Southern claims that the work done was merely an experiment to ascertain if Interstate's decision to discontinue heavy repairs on these cars was justified. The conclusion, according to defendant, was that the decision was justified. It is not clear from the evidence that these cars had been set out and marked for heavy repair by Interstate. The fact that they were *still in service at the time,* and further *that 392 are still* in service after *light* repair would seem to refute this. In addition, the Master correctly held that 467 cars had passed the stage of an 'experiment.'" (Accent added.)

Although there is a conflict in the evidence on the point, we cannot say the District Judge erred in finding that the crew at the Andover shop was not adequate to do this work and this required the recall of the 25 furloughed employees.

The master allowed these employees the benefit of 4-years salary, with deduction for unemployment insurance received and wages received in other work, in accordance with the maximum obtainable under section 5(2) (f) of the Act. The District Judge disagreed and, correctly we think, limited the recovery to the amounts that these 25 employees would have received had they performed the repair work on the 467 cars.

In this conclusion, the District Judge noted that these employees had not been constantly engaged but were furloughed from time to time. Consequently, without the stock acquisition they would not have been employed each day. It seems a logical construction of the statute. The District Judge reasoned in this way:

"It must be remembered that these employees were furloughed before the acquisition and not in anticipation of it. Thus, the furlough was not colorable in any sense; Interstate was wholly within its rights in utilizing this common

practice which it had employed several times in the past. *Assuming no acquisition had taken place, these employees would have been paid only when recalled by Interstate for work.* I think, therefore, that they are entitled to protective benefits only when they *should have been* recalled by Interstate and were not because of the acquisition of control by Southern. Any other arrangement would result in these employees receiving benefits during periods for which they would not have been paid had there been no acquisition, and being paid double for periods during which they may be recalled for work in the future (i. e., the regular salary plus the protective benefits). The purpose of the act was not to give the employees affected by the transaction a windfall and put them in a *better* position, but rather to insure that they will not be put in a worse position—that is, that they will maintain the status quo. The Interstate employees are to be paid for the work on the 467 Interstate cars which was done by Southern employees, and Southern is directed to forthwith furnish adequate up-to-date information by which the amount of work can be ascertained." (Accent added.)

It must be recalled that the master found, and the Court agreed, that these employees had been laid off beginning in May 1960 and continuing until the last of 1960 because "these employees had nothing to do and there was nothing upon which they could perform labor. They were surplus employees and no longer needed unless a program for building cars at the Andover, Virginia, shops was reinstated". Hence, their employment had become uncertain and precarious many months before the acquisition, and not in anticipation of it.

Before entering final judgment the Court required an ascertainment of the amounts due each of these 25 employees in regard to the diverted work on the 467 cars, and this sum was specifically allotted them in the final order.

(3) *Reconstruction and Enlargement of 336 Cars.* More than 15 months after the acquisition, Interstate purchased 336 50-ton used cars with the intention of converting them to carry greater loads. This work was done by an independent contractor at the direction of Interstate's management. The master held that it could have been done in the Andover shop of Interstate. In this he was overruled by the District Judge. The latter's ruling was based on the fact that the work was not done by Southern and that the means selected by Interstate to satisfy its need for additional cars was an allocation of work within the discretion of Interstate's management. We find no fault with this determination.

(4) *Cutting Down and Scrapping of Interstate Cars, and Salvaging of Parts.* Independent contractors were employed to scrap 1094 cars belonging to Interstate, salvage the parts and store them with Southern. For the same reasons he expressed with reference to the reconstruction of the 336 cars, the District Judge overruled the master's award to the 25 employees as damages for failure to have this work done by Interstate employees. Here, again, Southern was not involved, save in the immaterial respect of storage, and the diversion was no more than the exercise of a managerial judgment. There is no basis for upsetting this conclusion.

*Section Laborers*

The 12 maintenance-of-way employees—section laborers—were denied recovery by the master as well as by the District Court, for the reason that all of them except 2 were seasonal furloughs effected before the decision of the ICC approving the proposed acquisition. Interstate had in previous years purchased and used some power tools for maintaining its tracks. This may have been a factor in these furloughs. In any event, after the acquisition Interstate rented from Southern more equipment and it had no occasion to recall these section laborers. The rentals were paid exclusively by Interstate. The master found, and the

District Judge held, that the displacement of these men was not a result of the acquisition but instead an economic decision by Interstate itself. The situation was summarized by the District Judge as follows:

"All of these employees but two (who were furloughed in June, 1961) were furloughed prior to the acquisition of Interstate by Southern. There is little evidence to indicate that the reason for this furlough was other than the seasonal cut-offs which have also occurred in past years. There is some evidence that these men were furloughed because of the introduction of machinery and equipment used in the maintenance of tracks, but the record shows that there was very little equipment owned by Interstate prior to the acquisition. The Master found that these employees would have been called back for work except for the fact that after the acquisition Interstate began to *rent* some modern track and maintenance equipment which has replaced these employees.

"No work has been removed from Interstate lines, but rather the same amount of work is being done with these machines and fewer men. It seems clear that the utilization of machines was a case of internal technological improvement. There is no way to move any work on the track over to the Southern, and the improvements could have been made by Interstate whether or not Southern had purchased it."

It was thus an economy measure which had begun before Southern's acquisition and expanded thereafter. Hence there is no need to consider the question, mentioned by the Court and discussed in the briefs and in oral argument, of whether or not a technological improvement adopted after the acquisition of control is a factor of prejudice to a former or furloughed employee.

### Clerks

■ Seven employees classified as clerks were furloughed in December 1960 and January 1961. Their jobs were either abolished as a result of economies of operation and installation of office machines, which had been under study since 1958, or the employees in the discontinued positions having higher seniority forced them out of their jobs. In a general determination covering other claimants also, the District Judge concluded that none of these 7 were furloughed by reason, or in anticipation, of Southern's acquisition. These appellants do not show reversible error in this decision.

After the acquisition the accounting department of Interstate was transferred to Atlanta, Georgia. It caused the termination of 16 jobs. This affected 34 employees of Interstate. They were indemnified in accordance with the Act and the New Orleans Conditions and they are not plaintiffs here.

The judgment of the District Court will be

Affirmed.