**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**John Emanuel PANZAVECCHIA,
Defendant-Appellant.**

**No. 30044.**

United States Court of Appeals,
Fifth Circuit.

May 28, 1971.

Rehearing Denied July 2, 1971.

Leonard Moriber, Miami, Fla. (Ct. Apptd.), for defendant-appellant.

Robert W. Rust, U. S. Atty., Miami, Fla., Charles O. Farrar, Jr., Asst. U. S. Atty., for plaintiff-appellee.

Before JOHN R. BROWN, Chief Judge, and PHILLIPS * and INGRA-HAM, Circuit Judges.

ORIE L. PHILLIPS, Circuit Judge:

Panzavecchia, hereinafter referred to as the defendant, was charged by a two-count indictment with violations of 18 U.S.C. § 472.

The first count charged that "on or about January 12, 1968, at Shatkin Drugs, in Hollywood, Broward County, in the Southern District of Florida, John Emanuel Panzavecchia with intent to defraud, did pass and utter a certain counterfeit obligation of the United States, to wit: One counterfeit $10.00 Federal Reserve Note (Series 1950 E) drawn on the Federal Reserve Bank of San Francisco, California, bearing Serial No. L 42853082 D, and which the defendant then knew to be counterfeit, in violation of Title 18, United States Code, Section 472."

The language of Count One and the language of Count Two is identical, except the former alleges that the offense therein charged was committed "at Shatkin Drugs" and the latter alleges that the offense therein charged was committed "at Iris Drugs."

* Of the Tenth Circuit, sitting by designation.

Thus, it will be seen that the alleged different offenses involved two different Federal Reserve Notes, although the serial number of both was the same and they were both of the same series and issued by the same Federal Reserve Bank.

The defendant was tried and found not guilty on Count One and found guilty on Count Two. The court entered a judgment of acquittal on Count One and a judgment of conviction on Count Two and imposed sentence.

Prior to the return of the indictment in this case, the defendant had been charged in a three-count indictment with violations of 18 U.S.C. § 472. Count One of such indictment charged that "on or about January 12, 1968, at Hollywood, in Broward County, in the Southern District of Florida, the defendant, John Emanuel Panzavecchia with intent to defraud, did pass and utter a certain counterfeit obligation of the United States, to wit: One counterfeit $10.00 Federal Reserve Note (Series 1950 E) drawn on the Federal Reserve Bank of San Francisco, California, bearing Serial No. L 42853082 D, and which the defendant then knew to be counterfeit, in violation of Title 18, United States Code, Section 472."

The language in Counts Two and Three of such indictment was identical with the language of Count One.

The Government, in response to a motion of the defendant, filed a bill of particulars in an effort to distinguish the offenses sought to be charged in the three-count indictment by stating that the offense charged in Count One was committed at "Shatkin Drugs," the offense charged in Count Two was committed at "Iris Drugs," and the offense charged in Count Three was committed at "Burger King Restaurant."

It will be noted that the second indictment does not charge an offense committed at the Burger King Restaurant.

On appeal from the judgments of conviction on Counts One and Two of the three-count indictment, the court reversed such judgments. In its opinion, the court in part said:

"* * * Here three counts of an indictment contain verbatim language and their fusion into one and the same thing renders them inseverable as identifiable entries of separate and distinct criminal charges."

The court further said that because of the identity of the language in such three counts the charges therein were not sufficiently accurate to enable the defendant to plead former acquittal or conviction, should he subsequently be charged with similar offenses (citing Van Liew v. United States, 5 Cir., 321 F.2d 664).

The court also held that the bill of particulars was insufficient to cure the defects in each of the three counts, but stated at the close of its opinion:

"* * * Nothing which we have said in this opinion will, however, preclude the issuance of a new indictment in proper form. 18 U.S.C. § 3289."

Additional facts will be stated as we discuss the grounds urged by the defendant for reversal of the judgment of conviction on Count Two of the second indictment.

■ Count Two of the second indictment was not defective because it did not allege the name of the person to whom the Federal Reserve Note was passed.

18 U.S.C. § 472 does not require that there be an intent to defraud one of a particular class of persons or that the forged obligation be passed to one of a class of particular persons. The statute, in part here pertinent, reads:

"Whoever, with intent to defraud, passes, utters, * * * any falsely made, forged, counterfeited, or altered obligation or other security of the United States, shall be fined not more than $5,000 or imprisoned not more than fifteen years, or both."

■ Accordingly, we hold that the name of the person to whom the forged obligation is uttered or passed is not an essential element of the offense, and need

not be alleged or set out in the indictment.[1] However, it would be better to do so, because ordinarily the defendant would be entitled to the name or other identification of such person by a bill of particulars.

Defendant contends that he can assert the defense of double jeopardy to Counts One and Two of the second indictment, because he was acquitted by the jury on Count Three of the first indictment, notwithstanding that he was convicted on Counts One and Two of the first indictment.

Although the first indictment was fatally defective, the bill of particulars showed that three separate and distinct offenses were involved, and the record in the first case shows that the Government, at the trial on the first indictment, undertook to prove three separate and distinct offenses, and that the offense charged in Count Three of the First indictment was committed at the Burger King Restaurant and the offenses charged in Counts One and Two thereof were committed at other places, to wit, in Count One at Shatkin Drugs and in Count Two at Iris Drugs.

It must also be kept in mind that the trial court held the first indictment was good and permitted proof of three separate and distinct offenses and instructed the jury to return three separate verdicts, and that three separate verdicts were returned by the jury.

Even if the verdict on Count Three of the first indictment was inconsistent with the verdicts on Counts One and Two thereof, when viewed in the light of the holding of this court on the first appeal, such inconsistency would not have impaired the verdicts of conviction on Counts One and Two or the verdict of not guilty on Count Three.

Rational consistency between the verdicts of a jury is not required.[2]

Consistency in a jury's verdicts on separate counts of an indictment is not required.[3]

A conviction may not be set aside, even though the jury's verdict finding the defendant guilty on one count of an indictment is inconsistent with its verdict finding him not guilty on another count.[4]

It is well settled law that when a defendant appeals his conviction of a criminal offense and secures a reversal thereof, a retrial of a defendant for the same offense does not subject him to double jeopardy.[5]

1. Barbee v. United States, 5 Cir., 392 F.2d 532, 539; Buono v. United States, D.C. S.D.N.Y., 126 F.Supp. 644, 645; United States v. Ferra, 5 Cir., 427 F.2d 1348, 1350.

2. United States v. Costello, 2 Cir., 221 F. 2d 668, 676; affirmed 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397; Speers v. United States, 10 Cir., 387 F.2d 698, 703, cert. denied Sidary v. United States, 391 U.S. 934, 88 S.Ct. 1844, 20 L.Ed.2d 853; United States v. Andreadis, 2 Cir., 366 F.2d 423, 434, cert. denied 385 U.S. 1001, 87 S.Ct. 703, 17 L.Ed.2d 541; Maxfield v. United States, 10 Cir., 360 F.2d 97, 99.

3. Ehrlich v. United States, 5 Cir., 238 F. 2d 481, 485; United States v. Russo, 7 Cir., 335 F.2d 299, 301; Speers v. United States, 10 Cir., 387 F.2d 698, 703, cert. denied, 391 U.S. 934, 88 S.Ct. 1844, 20 L. Ed.2d 853; United States v. McGee, 6 Cir., 315 F.2d 479, 481; Dunn v. United States, 284 U.S. 390, 393, 52 S.Ct. 189, 76 L.Ed. 356.

4. Rua v. United States, 5 Cir., 321 F.2d 140, 143; Mogoll v. United States, 5 Cir., 158 F.2d 792, 793; Lambert v. United States, 5 Cir., 101 F.2d 960, 963.

5. United States v. Ewell, 383 U.S. 116, 124–125, 86 S.Ct. 773, 15 L.Ed.2d 627; Green v. United States, 355 U.S. 184, 189, 78 S.Ct. 221, 2 L.Ed.2d 199; Trono v. United States, 199 U.S. 521, 533, 26 S.Ct. 121, 50 L.Ed. 292; Stroud v. United States, 251 U.S. 15, 18, 40 S.Ct. 50, 64 L.Ed. 103; See also, United States v. Tateo, 377 U.S. 463, 466, 84 S.Ct. 1587, 12 L.Ed.2d 448, where the reversal was in a collateral proceeding. The reason for the rule is stated in United States v. Tateo, supra, at page 466, 84 S.Ct. at page 1589, as follows:

"* * * Corresponding to the right of an accused to be given a fair trial is the societal interest in punishing one whose guilt is clear after he has obtained such a trial. It would be a high

The rule applies in a case where, as here, an appellate court found the original indictment or information defective and the defendant was tried on a new indictment.[6]

We hold that the trial of the defendant on Counts One and Two of the second indictment did not subject him to double jeopardy.

■ On the second trial, the court did not err in refusing to admit evidence that the owner of Iris Drugs had failed to comply with the Florida statute designed to inform the public of the name of the owner of a business operated under a fictitious name. Failure of the owner of Iris Drugs to comply with such statute in nowise affected the criminality of uttering and passing to Iris Drugs a counterfeit Federal Reserve Bank Note, and was wholly irrelevant to any issue in the case.

The evidence showed that on January 12, 1968, Harry R. Iris was the manager of Iris Drugs; that on such date the defendant came to the drug store; that at that time Iris was waiting on trade at the front cash register and the tobacco and checkout counter; that the defendant came to such counter and asked for a pack of cigarettes and handed Iris a ten dollar bill; that he suspected the bill from the way it felt and looked, but that he finally accepted it and gave the defendant the change and a package of cigarettes; that he waited on a few more customers and then rushed over to the First National Bank of Hollywood, located diagonally across the street intersection from the drug store; that he gave the note to Milton Billow, at the latter's cage; that Billow kept the note; that the defendant resembled the man who gave him the bill on January 12, 1968, but that two years

had elapsed (actually two years, three months, eighteen days), and that he could not positively identify him as the man who purchased the package of cigarettes and gave him the ten dollar bill. He further testified, however, that he was able to identify and did identify the person who was the defendant at the first trial as the man who purchased the cigarettes and gave him the ten dollar bill on January 12, 1968, and that he still had a vivid recollection of how the defendant at the first trial looked, as he observed him in the courtroom from the witness stand; and that the defendant at the first trial was the same man who was the defendant then on trial.

■ We hold that there was no error in admitting the testimony of Iris that he was able to identify the defendant at the first trial as the man who purchased the cigarettes and gave him the ten dollar bill. Iris had been subject to cross-examination at the first trial, and his statements were necessary as background for his testimony and explanation that he still had a vivid recollection of the appearance of the man who was the defendant at the first trial.[7]

■ The testimony of Iris, and other corroborating facts and circumstances, adequately identified the defendant as the man who uttered and passed the Federal Reserve Note to Iris.

Samuel B. Harlan testified that on January 12, 1968, he was an assistant vice president of the First National Bank of Hollywood; that on that date Milton Billow, who was then the head teller at the bank, called him to his cage and showed him a Federal Reserve Note that Billow said Iris had brought to him; that Billow put his initials on the note in

---

price indeed for society to pay were every accused granted immunity from punishment because of any defect sufficient to constitute reversible error in the proceedings leading to conviction. * * * "

6. United States v. Ball, 163 U.S. 662, 671–672, 16 S.Ct. 1192, 41 L.Ed. 300; United States v. Tateo, 377 U.S. 463, 465, 84 S.Ct. 1587, 12 L.Ed.2d 448; United

States v. Ewell, 383 U.S. 116, 121, 86 S.Ct. 773, 15 L.Ed.2d 627; Eubanks v. Louisiana, 356 U.S. 584, 589, 78 S.Ct. 970, 2 L.Ed.2d 991; United States v. Berry, 7 Cir., 309 F.2d 311, 313; Stroud v. United States, 10 Cir., 283 F.2d 137, 140.

7. See United States v. Schwartz, 3 Cir., 390 F.2d 1, 6; United States v. De Sisto, 2 Cir., 329 F.2d 929, 933.

his presence; that he was familiar with Billow's signature, and he identified Government Exhibit 2, on which the second count of the indictment was based, as the Federal Reserve Note on which Billow placed his initials on January 12, 1968; and that after Billow placed his initials on such Federal Reserve Note it was then sent by the Bank, in accordance with regular United States Treasury Department procedures, to the United States Secret Service, accompanied with a completed report on a form prescribed by the United States Treasury Department.

Counsel for the defendant contend that Harlan did not personally see Iris give the ten dollar note to Billow, and that Harlan's testimony that Billow told him that Iris brought such note to Billow was hearsay. Of course, it was hearsay.

Sheila Shatkin testified that her husband, Harry Shatkin, owned the Shatkin Drug Store, operated under the name, "Shatkin Drugs"; that they opened the store about 9 a. m. on January 12, 1968; that her husband then went out to get them some coffee; that shortly after they opened the store and before her husband returned with the coffee, the defendant came in and purchased a bottle of aspirin and paid for it with a ten dollar bill and she gave him the change; that shortly after the defendant had left the store another customer came in; that her husband had returned; that he sold the other customer a two dollar item and the customer paid her for it with another ten dollar bill; that there were no other ten dollar bills in the cash register, except the two she had received that morning from the defendant and the second customer; that she told her husband the first two sales that morning had been paid for with ten dollar bills and he ought to go to the bank, which was a short distance away from the drug store, and have the ten dollar bills changed to ones or fives because she might not have enough small bills for change during the balance of the day. She further testified that she was looking out of the window and saw her husband cross the street and go into the bank.

Harlan testified further that he was called to the walk-up window by the drive-in teller on January 12, 1968; that Harry Shatkin was there; that the teller had two ten dollar bills which he gave to Harlan; that he gave Shatkin a receipt therefor; that he took the bills to the head teller, Billow, and had him initial them; that then, in accordance with standard Treasury Department procedure, the bills were sent to the United States Secret Service, accompanied by a completed report with respect to such bills on a Treasury Department form.

Iris testified that it was about 10 a. m. when he sold the defendant the package of cigarettes; that he suspected the bill was counterfeit; that after he had waited on a few more customers, he rushed over to the bank and took the bill he had received from the defendant for the cigarettes to Billow at his head teller's cage, asked him if it was good, and turned it over to Billow.

 While it is obvious that Billow, the drive-in teller at the walk-up window, and Harlan thought all three bills were counterfeit, else they would not have followed the procedure prescribed by the United States Treasury Department for banks to follow when they suspected they had received counterfeit United States obligations, the trial court refused to allow them to so testify when objection thereto was raised by counsel for the defendant.

It is also obvious that the incident when Billow called Harlan to his cage and initialed one ten dollar Federal Reserve Bank Note and gave it to Harlan occurred at one time, and the incident when Harlan took the two Federal Reserve Bank Notes which he had received from Shatkin to Billow and had Billow initial them occurred at a different time, probably prior to the time Billow called Harlan to the cage and initialed one note and gave it to Harlan.

In view of those facts and the fact that Billow received only the one note, and other surrounding facts and circumstances, it is a reasonable inference that the

single note Billow initialed and turned over to Harlan was the note he received from Iris.

Hence, we hold that the Government's Exhibit 2 was properly identified as the note charged in the second count of the second indictment and was properly received in evidence.

■ The testimony of Joseph M. Capasso, called as a witness for the Government, established these facts:

On January 29, 1970, Capasso was a Special Agent for the United States Secret Service, assigned to New York City. On that date, he went to the defendant's home in Astoria, New York, for the purpose of arresting him for the offenses charged in the second indictment. Capasso told the defendant his name, that he was an Agent of the United States Secret Service, and furnished him with identification. Capasso told the defendant that he was under arrest and informed him of the charges against him, and advised the defendant that "before we asked him any questions, that he would have the right to remain silent and that anything that he said could be used against him, and that he had the right to an attorney and that he could stop the questioning at any time and have an attorney present," and that "if he could not afford an attorney, that the Court would provide an attorney for him."

Such testimony by Capasso stands uncontradicted in the record.

Capasso then transported the defendant to the offices of the Special Agents of the United States Secret Service at 90 Church Street, New York City. On arrival at such offices, defendant was fingerprinted and a photograph of him was taken.

Capasso then took defendant to the prisoner's search room. He testified, "That is the room we normally take people in after we have arrested them for questioning." He told the defendant "[W]e have a form here, it is a standard form. If you want to talk to me about the case you may. * * * I will read you this form and then you read it and if you want to speak, well, fine. Sign it. If not, well, don't sign it."

The form was SS Form No. 1737. It is set forth, as it read when finally completed, in Note 8 hereto.[8]

Capasso read the form to the defendant and the defendant then read it. Capasso then asked the defendant if he understood it and the defendant said he did. He then signed the Waiver of Rights in the form. Capasso signed the Certification and Agents Christian and Healy

8. "SS Form No. 1737
(Revised 10–17–67)
"WARNING AND CONSENT TO SPEAK
"You must understand your rights before we ask you any questions.
"You have the right to remain silent.
"Anything you say can be used against you in court, or other proceedings.
"You have the right to talk to a lawyer for advice before we question you and to have him with you during questioning.
"If you cannot afford a lawyer and want one, a lawyer will be appointed for you. If you decide to answer questions now without a lawyer present, you will still have the right to stop the questioning at any time. You also have the right to stop the questioning at any time until you talk to a lawyer.
"WAIVER OF RIGHTS
"I have read this statement of my rights and it has been read to me, and I understand what my rights are. I hereby voluntarily and intentionally waive my rights and I am willing to make a statement and answer questions. I do not want a lawyer. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me.
"/s/ John E. Panzavecchia
Signature
"1–29–70 8:50 AM
Date and Time
"CERTIFICATION
"I HEREBY CERTIFY that the foregoing Warning and Waiver of Rights were read by me to the above signatory, and that he also read it and has affixed his signature hereto in my presence.
"/s/ Joseph M. Capasso
Signature—Agent
"/s/ James L. Christian
Witness
"/s/ Thomas M. Healy
Witness"

signed it as witnesses. (See Note 8, supra.)

The completed form was marked as Government Exhibit 5 and admitted into evidence over the objection of counsel for the defendant, on the ground that it was not a voluntary waiver.

Capasso testified that after the defendant signed the waiver he had a conversation with him; that he asked the defendant "what were the problems he had in Miami"; that the defendant replied that he was accused of passing three counterfeit notes; that he asked the defendant if he knew they were counterfeit notes; that the defendant replied he was "riding around in a car with a person" who owed him some money for some merchandise, and this person gave him 18 ten dollar Federal Reserve Notes; that as they were driving around he told such person to stop, that he wanted to buy a package of cigarettes, and that he purchased a package of cigarettes, using one of the ten dollar notes to pay for it; that when he returned to the car such person (we use the term "such person" because the defendant refused to name or identify him) said, "See how easy it is to pass one of these notes." The defendant stated he did not at that time know the notes were counterfeit, but that when they stopped the next time such person told him the notes were counterfeit, and that because he owed such person a favor he agreed to assist him in passing them; that the defendant further stated that he went into another store, which he believed was a Whalen's Drug Store, and passed another of the counterfeit notes; and that he then knew the notes were counterfeit; that thereafter he went into another Whalen's Drug Store, where he attempted to pass another counterfeit note; that the clerk became suspicious and he fled the store, leaving the note there; that he gave the remaining notes to the person with whom he was riding around and from whom he had received them. As stated above, the defendant refused to name, describe, or to otherwise identify such person.

Counsel for the defendant moved to strike all of the testimony relative to the defendant's statement on the ground that the statement was not voluntarily made. The motion was denied.

The defendant was fully warned with respect to all of his rights, both verbally when he was first arrested and shortly thereafter when he was taken to the search room at the Special Agents' offices, and before he signed the waiver, he was fully warned again as to all of his rights by the written statement, which was read to him and which he read and said he understood. He was told by Capasso if he wanted to talk to him to sign the waiver, and if he did not want to talk not to sign it.

There was no "lengthy interrogation or incommunicado incarceration" before the oral statement was made by the defendant, and he made no written statement.

Capasso testified that he did not at any time coerce, induce, or entice the defendant, or make any promise or threats to him to get him to make such statement. The defendant did not deny the evidence of Capasso nor testify that the statement he gave was not voluntarily made. We think the instant case is clearly distinguishable from Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694.

It is true that Capasso and the defendant stopped for each of them to have a cup of coffee. The record does not show when they stopped for coffee, but from the parts of the record that we have, we think it may reasonably be inferred that it was while they were on their way from the defendant's home to the Secret Service Agents' office. Capasso jokingly said to defendant, "Well, why don't you give me a statement, so I can go down to Miami. I could use a vacation." The defendant did not testify that he took Capasso's remark seriously or that it in anywise caused him to make the statement. As a matter of fact, it does not seem to us that a remark of that kind could induce an unwilling defendant to waive his rights.

We conclude the evidence fully justified the conclusion of the trial court that the statement was made voluntarily by the defendant, after he had been fully apprised of his rights.

Accordingly, the judgment is affirmed.

For opinion on remand see 331 F.Supp. 671.